UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JUAN VALDEZ #1-10, individually
and on behalf of those similarly
situated; and the WORKPLACE
PROJECT, INC.,

                Plaintiffs,        <u>MEMORANDUM AND ORDER</u>
                                           05-CV-4323 (JS)(ARL)

      -against-

TOWN OF BROOKHAVEN; JOHN JAY
LAVALLE, Individually and as the
Supervisor of the Town of
Brookhaven; COUNTY OF SUFFOLK;
STEVE LEVY, Individually and as
the County Executive of the
County of Suffolk,

                Defendants.
----------------------------------X

Appearances:

For Plaintiffs:     Foster S. Maer, Esq.
                  Sandra Del Valle, Esq.
                  Puerto Rican Legal Defense & Education Fund
                  99 Hudson Street, 14th Floor
                  New York, NY 10013

For Defendants:

Town of Brookhaven  Jeltje DeJong, Esq.
John Jay LaValle    Devitt Spellman Barrett
                  50 Route 111
                  Smithtown, NY 11787

County of Suffolk   Brian P. Callahan, Esq.
Steve Levy          Luz Adriana Lopez, Esq.
                  Suffolk County Attorneys Office
                  100 Veterans Memorial Hwy
                  Hauppauge, NY 11788-4311

SEYBERT, District Judge:

INTRODUCTION

      On September 13, 2005, Plaintiffs commenced the instant

putative class action against Defendants Town of Brookhaven, John

1

Jay LaValle (collectively, the "Town"), the County of Suffolk and Steve Levy (collectively, the "County"), alleging violations of the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment and the Fair Housing Act. The Complaint alleges that Defendants have adopted a practice of utilizing "no notice, no standards" evictions to oust Latino tenants from the non-owner occupied homes where they reside.

Plaintiffs initially sought provisional relief in the form of a temporary restraining order against the Town,[1] precluding it from engaging in the alleged "no notice, no standards" evictions. That application was denied by this Court on September 13, 2005. Presently pending is Plaintiffs' motion for a preliminary injunction, preventing the Town of Brookhaven from engaging in any similar "no notice, no standards" evictions. Specifically, Plaintiffs request that this Court issue an Order enjoining Defendants

> from seeking to evict or evicting residental
> tenants unless defendants determine, in
> reliance on disinterested expert opinion, that
> a residential tenant living in housing which
> presents such an imminent and dire danger that
> said tenant must be immediately evicted
> without notice and an opportunity to
> challenge, and unless defendants 1)
> immediately inform the affected tenants and

---

[1] According to Plaintiffs, they make the instant application based upon their claims against the Town alone. Therefore, the Court at this time does not consider the Amended Complaint's allegations with respect to the County. The Court will address such issues when it rules upon the pending motions to dismiss, which, as of the filing of this Order, have yet to be fully briefed.

> plaintiffs' attorneys by phone or in person of
> that determination and the reasons for it and
> 2) provide the affected tenants both
> sufficient time to move their belongings and
> effective housing relocation assistance.

(Pls.' Proposed Order to Show Cause for Preliminary Relief at 2.)

Plaintiffs also request this Court enjoin Defendants from investigating housing code violations, and require Defendants to provide more effective relocation assistance to class members that have been displaced from their residences. From September 19-22, 2005, this Court presided over a four-day hearing ("Hearing") concerning Plaintiffs' preliminary injunction motion.

BACKGROUND

I.   The Complaint

The Complaint is styled as a putative class action, alleging the deprivation of the class' constitutional rights in violation of 42 U.S.C. §§ 1983, 1988 and violation of the class' rights guaranteed by the Fair Housing Act, 42 U.S.C. § 3613(a). The Complaint was amended on October 20, 2005.

The putative class is described as "all Latino persons living in Brookhaven Township, New York." (Am. Compl. ¶ 13.) The "named," yet anonymous class Plaintiffs are Juan Valdez Nos. 1-10. (Id. ¶ 6.) Juan Valdez Nos. 1-10 are Latino day laborers[2] who

_____

[2]   Day laborers perform work in a wide variety of areas, including landscaping and construction. The circumstances of their employment, however, is inconsistent. Day laborers acquire work by standing on street corners, waiting for contractors to select them. They are oftentimes hired on a day-to-day basis, and are paid less than minimum wage. (Id. ¶ 22.)

reside in the Town of Brookhaven. (Id.) The Juan Valdez Plaintiffs have been "forced to live in the only place they can afford that is available to them: non-owner occupied overcrowded rental housing." (Id. 27.)

The Amended Complaint alleges that "at some point in late 2004 or early 2005" Defendants established a program directed at "heightened enforcement of zoning code violations regarding quality of life" (the "Program"). (Id. ¶ 31.) The Amended Complaint describes the Program as an initiative undertaken to "solicit and investigate complaints from . . . residents and employ 'no notice, no standards' evictions that would throw tenants out on the street without providing any prior notice or sufficient time to find somewhere else to live." (Id.) According to the Amended Complaint, 117 homes in the hamlet of Farmingville have been targeted for action pursuant to the Program. (Id. ¶ 34.)

On June 19, 2005, ostensibly in the furtherance of the Program, the Town commenced the purported "no notice, no standards" evictions. Specifically, the Town began obtaining ex parte temporary restraining orders ("TROs"), preventing Latino tenants from returning to their residences. According to the Amended Complaint, "Town officials, with the assistance of Suffolk County police" have used these ex parte orders to oust hundreds of Latino tenants from their residences on eleven different occasions. (Id. ¶ 38.) The Latino tenants only learn that they are being

restrained from re-entering their residences "when they arrive
. . . and find that their homes have been shuttered and locked or
when they return home from work and [are] greeted by Town officials
and Suffolk police with restraining orders." (Id. ¶ 33.) The
Amended Complaint alleges that "[a]lthough the Town has acted as if
an emergency has existed necessitating the lack of notice to
tenants, . . . the Town would take months from the time it began
its investigations of houses and discovered possible housing code
violations to the time they actually apply for a temporary
restraining order." (Id. ¶ 50.) Juan Valdez Nos. 1-7 are
purportedly Latinos presently residing in overcrowded homes that
live in fear of an imminent "no notice, no standards eviction."
Juan Valdez Nos. 8-10 are Latinos that have already been subjected
to a "no notice, no standards" eviction.

The Amended Complaint essentially alleges two claims.
First, Plaintiffs contend that Defendants are depriving them of
their Fourteenth Amendment due process rights by taking their
property without providing them with any notice or the opportunity
for a hearing, or otherwise observing any established procedure
before removing them from their homes. Second, Plaintiffs allege
that Defendants' method of enforcing health, safety and zoning laws
is discriminatory because the enforcement program targets Latinos.
Plaintiffs assert that such actions violate the Equal Protection
Clause of the Fourteenth Amendment, and Sections 804(a) and 804(b)

of the Fair Housing Act, 42 §§ 3604(a),(b).

With respect to relief, Plaintiffs request a permanent injunction, enjoining the Defendants from: (1) engaging in any further "no notice, no standards" evictions; (2) undertaking any additional activities to the Program until "defendants promulgate a narrowly drawn statute establishing standards governing it;" (3) harassing or treating differently from other persons the plaintiffs and the class members. In addition Plaintiffs seek: (4) a declaration that Defendants' actions violate their due process, equal protection and Fair Housing Act rights; (5) compensatory and punitive damages; and (6) reasonable attorneys fees pursuant to 42 U.S.C. 3613(a)(3)(c)(2) and 42 U.S.C. § 1988.

II. The Hearing

At the Hearing, the Court heard testimony from several individuals: Irma Solis, a representative from Plaintiff WorkPlace Project; three purported Juan Valdezes; Sister Margaret Smythe; and Town Investigator Paul Degan. The Court also received into evidence ten (10) temporary restraining orders signed by New York State Supreme Court Judges restraining re-entry to various premises;[3] a list of addresses targeted by the Town for enforcement of the state and Town housing, building and safety codes; and

---

[3] The TROs concern premises located at: (1) 868 Horseblock Road (Pls.' Ex. 1); (2) 19 Dougbeth Drive (Pls.' Ex. 2); (3) 177 Woodycrest Drive (Pls.' Ex. 3); (4) 11 Cedar Oaks Avenue (Pls.' Ex. 4); (5) 196 Berkshire Drive (Pls.' Ex. 5); (6) 16 Starling Place (Pls.' Ex. 7); (7) 9 Granny Road (Pls.' Ex. 8); (8) 6 Spurwoods Lane (Pls.' Ex. 9); (9) 11 Second Street (Pls.' Ex. 10); and (10) 86 Berkshire Drive (Pls.' Ex. 11).

photographs and illustrations of the premises at 33 Woodycrest Drive, which was subjected to an _ex_ _parte_ restraint on occupancy. Below is a brief recount of some of the more pertinent portions of the Hearing.

    A.   <u>Juan Valdez Nos. 2, 6 and 8</u>

        The Court heard testimony from three individuals purported to be representatives of the Juan Valdez Plaintiff class. Juan Valdez Nos. 2 and 6 testified on behalf of Latinos who live in fear that they will lose their residences due to the Town's enforcement initiative. Juan Valdez Number 8 testified on behalf of those members of the class (Juan Valdez Nos. 8-10) who have been ousted from their homes pursuant to _ex_ _parte_ TROs restraining re-entry. It is apparent from the testimony elicited at the Hearing that most, if not all of the Juan Valdez Plaintiffs are not present in this Country legally.

        Juan Valdez Number 6 ("Number 6") was the first anonymous Plaintiff to testify. His testimony evidenced all of the dangers inherent with permitting a party to proceed anonymously. Number 6 failed to authenticate the sworn affidavit that he ostensibly signed in the furtherance of the instant action, and otherwise failed to establish that he was, indeed, the Plaintiff he purported to be. Accordingly, Juan Valdez Number 6 was dismissed from this action. (Tr. at 112-13.)

        Juan Valdez Number 2 ("Number 2"), however, established

himself to be a viable Plaintiff. (Tr. 159-74.) Number 2 testified that he is a Mexican Day Laborer who presently resides at 60 Granny Road. He has lived at that location for the past two and one-half years with twenty other Mexican Day Laborers. He pays a monthly rent of $200. Number 2 testified that he is aware of actions that the Town has taken against other overcrowded dwellings in the Farmingville area, and that he is aware that his residence is presently being targeted by Town investigators. He is in fear that the Town will impose a similar restraint on his re-entering his premises that the Town has imposed at several other locations.

Juan Valdez Number 8 ("Number 8") is a Mexican Day Laborer who was ousted from his residence at 9 Granny Road in Farmingville. (Tr. at 208-10.) The order restraining re-entry into the premises at 9 Granny was issued on June 21, 2005 by the Honorable Arthur G. Pitts, New York Supreme Court Judge for the County of Suffolk. (Pls.' Ex. 8.) After losing his ability to reside at 9 Granny Road, Number 8 has unsuccessfully sought alternative housing. He presently lives in a tent outside the premises located at 196 Berkshire Drive - a premises that was also subject to a Supreme Court order restraining re-entry. (Pls.' Ex. 5.)

B. Town Investigator Degen

Paul Degen ("Degen," or "Investigator Degen") is an investigator for the Town of Brookhaven's Attorney's Office (Tr. at

354). In his position as Town Investigator, Degen enforces New York state building and fire code and Town code provisions on behalf of the Town. He was an affiant in connection with at least three of the eleven TROs obtained by the Town of Brookhaven. At the Hearing, Degen explained the circumstances where the Town of Brookhaven would typically seek to obtain a restraining order, stating "In my experience, it has always been in the extreme cases of health and safety . . . [the Town] would do that under conditions that would meet health and safety problems to the occupants of the house." (Tr. at 358.) Degen testified that, once the order restraining re-entry was obtained from a New York State Supreme Court Judge, it was served on the owner of the premises and then posted at the residence to inform all tenants. (Tr. 358-59.) The Town of Brookhaven's Attorney's Office supervised this procedure. (Tr. at 408. Degen stated that, in his experience as a Town Building Investigator, he was not aware of any _ex_ _parte_ orders restraining re-entry that were issued in 2004. (Tr. at 418.)

Degen specifically recounted his experience with two locations: 33 Woodmont Place and 9 Granny Road. Both premises were located in Farmingville. Degen testified that, shortly after his observation of the premises at 33 Woodmont, the Town Attorney's Office obtained an _ex_ _parte_ TRO restraining re-entry into the premises. Degen testified that the tenants disregarded the TRO,

9

and on June 19, 2005, the Town then obtained a search warrant to enter and search the premises.[4]

Degen conducted his initial observations of 9 Granny Road on April 11, 2005. His external observations included overcrowding and debris located outside the premises. Degen supplemented his external observations with an interior examination of the premises - he was admitted entry by one of the tenants. Inside the premises, Degen discovered numerous code violations, including the existence of a propane gas grill located in an illegal basement apartment.

On June 21, 2005, the Town filed a verified complaint and an application for a TRO at New York State Supreme Court for the County of Suffolk concerning the premises located at 9 Granny Road. (Pls.' Ex. 8.) The enforcement action was styled <u>Town of Brookhaven v. 815 Horseblock Road Management LLC</u>. (Pls.' Ex. 8.)[5] The TRO was signed by New York Supreme Court Judge Arthur G. Pitts that same day. (Pls.' Ex. 8.) The specific conditions cited in support of the issuance of the temporary restraining order included: overcrowding, lack of smoke and carbon monoxide

---

[4] There appears to be some confusion concerning the dates that Degen conducted surveillance on 33 Woodmont. He testified that he originally began observing the premises in June 2004, and the TRO was issued soon thereafter. (Tr. at 410-11.) It appears that Degen intended to refer to June 2005 as the first surveillance period.

[5] According to the Town's Verified Complaint, 815 Horseblock Management Company LLC is the owner of the premises located at 9 Granny Road. (Pl.'s Ex. 8, Verified Compl. ¶ 3.)

detectors, and a propane fueled barbeque grill within the interior of a basement apartment, the property owner's failure to file a rental registration form, and litter. (Pls.' Ex. 8, McCarthy Affirm.) As explained above, such conditions were observed by Investigator Degen on or about April 11, 2005.[6]

Degen testified that, after the TRO was signed, the notice was posted at the premises at 9 Granny Road, and the tenants adhered to the restriction on re-entry. (Tr. at 401.)

DISCUSSION

I.   Standard Of Review On A Motion For A Preliminary Injunction

The typical requirements for the issuance of a preliminary injunction are well-established. A movant must establish "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly" in the movant's favor. Fed. Express Corp. v. Fed. Espresso, Inc., 201 F.3d 168, 173 (2d Cir. 2000).

Where, as here, the injunction is sought "against government action taken in the public interest pursuant to a statutory or regulatory scheme" a movant "must show two things: 1) that the injunction is necessary to prevent irreparable harm to the

---

[6]     Frank Rignola, another Town building inspector, was also an affiant in support of the application.

11

movant; and 2) that the movant is likely to succeed on the merits."
Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 96-97 (2d
Cir. 2005).

The Town accurately points out that, "where the movant
seeks a mandatory injunction (one that will alter the status quo)
rather than a prohibitory injunction (one that maintains the status
quo), the likelihood-of-success standard is elevated: the movant
must show a clear or substantial likelihood of success." Id. at
97. The heightened burden has application to certain of
Plaintiff's requests. For example, to the extent Plaintiffs
request that this Court enjoin Defendants from engaging in certain
code enforcement procedures that have yet to be undertaken, such a
request is prohibitory, and Plaintiffs need only demonstrate a
likelihood of success on the merits. See id. at 97 (finding a
preliminary injunction application "plainly prohibitory" because it
sought to maintain the election "undecided" as it had been prior to
the commencement of the action). However, to the extent Plaintiffs
request that this Court require Defendants to provide them with
additional temporary relocation support, such a request is in the
nature of a mandate and the heightened burden applies.

II. Plaintiff's Request For A Preliminary Injunction

Plaintiffs argue that the Town is bypassing any
procedural safeguards and improperly denying them access to their
residences in violation of their "rights to due process . . . and

their right to be free from the discriminatory enforcement of housing laws under the Fair Housing Act." (Pls.' Post-hearing Mem. of Law at 1.) Plaintiffs claim that the Town is undertaking these "evictions" in the furtherance of a "secret new program that provides no prior notice to those evicted . . . no standards whatsoever as to under what circumstances such . . . evictions are to be initiated." (Id.) Plaintiffs point out that the "new program" has resulted in the eviction of only Latino tenants.

Accordingly, Plaintiffs contend that they have sufficiently established a likelihood of success on the merits. Moreover, relying upon their potential displacement from their homes as evidence of irreparable harm, Plaintiffs contend that they have established entitlement to preliminary injunctive relief.

The Town raises several objections to the viability of Plaintiffs' claims. First, the Town argues that the Rooker-Feldman doctrine, and/or the Younger abstention doctrine deprive(s) this Court of the jurisdiction necessary to decide this action. Next, the Town argues that Plaintiffs have not sufficiently established irreparable harm such that preliminary injunctive relief is warranted. Finally, the Town argues that Plaintiffs have not sufficiently established a likelihood of success on the merits with respect to either their constitutional or Fair Housing Act claims. The Court addresses each issue in turn.

A.    Rooker-Feldman

The Town argues that, as a threshold matter, the Rooker-Feldman doctrine precludes this Court from addressing certain of the putative class Plaintiffs' claims. See Dist. Court of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923). The Court agrees, in part.

The Rooker-Feldman doctrine, which is named after a pair of cases decided by the Supreme Court in 1923 and 1983 respectively, is invoked to preclude federal district court appellate review of state court determinations. The proper application of the Rooker-Feldman doctrine was recently clarified by the Supreme Court in Exxon Mobil Corp. v. Saudi Basic Industries Corp., ___ U.S. ___, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (Mar. 30, 2005). In Exxon, the Supreme Court limited what it viewed to be a growing, unnecessary expansion of the applicability of the doctrine, stating: "The Rooker-Feldman doctrine . . . is confined to cases of the kind from which the doctrine acquired its name: cases brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 1521-22.

Here, the Juan Valdez Plaintiffs who have been ousted pursuant to ex parte TROs clearly are the losers as the result of state court proceedings commenced by the Town. Further, all such

14

Plaintiffs, in substance, seek a review and rejection of the TROs signed by state court judges on the grounds that such orders were improperly issued without recognition of Plaintiffs' due process rights.

But an essential caveat to the <u>Rooker-Feldman</u> doctrine is that it may only be applied against a federal litigant that was a party to the state court proceeding. <u>Johnson v. De Grandy</u>, 512 U.S. 997, 1006, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994) ("the invocation of <u>Rooker</u>/<u>Feldman</u> is . . . inapt here, for unlike Rooker or Feldman, the [plaintiff] was not a party in the state court. [Plaintiff] was in no position to ask this Court to review the state court's judgment and has not directly attacked it in this proceeding.")

Here, not all Juan Valdez Plaintiffs were joined as defendants in the state court proceedings. Only four of the ten TROs that were submitted to this Court list the tenants as Defendants in the caption: (1) 19 Dougbeth; (2) 177 Woodycrest; (3) 11 Cedar Oaks; and (4) 196 Berkshire. Should any of the tenants that previously resided at these locations wish to challenge the propriety of the issuance of a TRO, they must raise their objections in a state court proceeding.[7] But with respect to the six remaining TROs — concerning the premises at 868 Horseblock

---

[7]     Indeed, certain of these individuals have already proven their ability to do so by filing motions to vacate the TROs with regard to the premises at 196 Berkshire Drive. (Tr. at 334.)

Road, 16 Starling Place, 9 Granny Road, 6 Spurwoods Lane, 11 Second Street and 86 Berkshire Drive — there are no tenants listed in the caption. The former-tenants at these six locations, such as Juan Valdez No. 8 who resided at 9 Granny Road, cannot be considered parties to the state court action. Accordingly, <u>Rooker-Feldman</u> may not be invoked to preclude their suit.[8]

    B.   <u>Younger Abstention</u>

Notwithstanding the applicability of <u>Rooker-Feldman</u> the Town urges this Court to abstain from deciding Plaintiffs' constitutional and Fair Housing Act claims pursuant to the doctrine articulated by the Supreme Court in <u>Younger v. Harris</u>, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). "<u>Younger</u> abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." <u>Diamond "D" Construction Corp. v. McGowan</u>, 282 F.3d 191, 198 (2d Cir. 2002). While <u>Younger</u> abstention originally was "born in the context of state criminal proceedings," <u>id.</u>, it has equal application where, as here, the underlying state court proceeding involves the enforcement of a municipality's building and housing codes. See <u>Huffman v. Pursue,</u>

---

[8] Obviously, <u>Rooker-Feldman</u> has no preclusive effect upon the claims of the Juan Valdez Plaintiffs who have yet to be subject to any <u>ex parte</u> TRO. These individuals have not had any state court order issued against them.

Ltd., 420 U.S. 592, 604, 95 S. Ct. 1200, 1208, 43 L. Ed. 2d 482 (1975) (finding Younger abstention required in deference to a pending state nuisance action).

At the outset, the Court notes that, contrary to the Town's assertions, Younger has no proper application with respect to those Plaintiffs, such as Juan Valdez No. 2, who have yet to be subjected to any enforcement proceeding implemented by the Town. This is so because, with respect to these Plaintiffs, there is no ongoing state court proceeding in favor of which this Court may abstain.[9]

The Juan Valdez Plaintiffs who have been evicted from their residences, but have not been joined as parties in any state court proceeding present a more complicated issue. The claims of such Plaintiffs are inextricably linked with pending state supreme court actions against their respective residences. Further, it is not disputed that the municipality has an important interest in enforcing its building and housing code for the benefit of the health, safety and well-being of its residents. Thus, the first

_____

[9] The Town, in its Post-Hearing Memorandum of Law, summarily challenges the ripeness and "speculative" nature of the claims of Plaintiffs such as Juan Valdez Number 2. Such challenge, however, is belied by the Town's stipulation at the Hearing that: "it is a very possible event that [the houses that the Juan Valdezes presently reside in] would be closed in the future." (Tr. at 205.) In order to challenge a municipality's purportedly unconstitutional conduct, a plaintiff must show "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. There is no requirement that a plaintiff be charged or prosecuted . . . before he or she may bring suit." New York State Motor Truck Ass'n v. Pataki, No. 03-CV-2386, 2004 WL 2937803, at *8 (S.D.N.Y. Dec. 17, 2004). Plaintiffs have satisfied their burden of establishing standing in this case.

two <u>Younger</u> criteria are satisfied.

Yet, the Court cannot agree that the third <u>Younger</u> prerequisite is satisfied. Based upon the nature of the injury complained of, the ousted Juan Valdezes have not been afforded any <u>adequate</u> opportunity to raise their constitutional claims. The very practice Plaintiffs challenge is the denial of notice and an opportunity to be heard. In order to raise their due process claims, Plaintiffs would first have to intervene in the pending state action and then seek to vacate the TRO. Not only is their right to intervene in the state action unclear, but their mere ability to do so would not support a finding of adequacy. Throughout this process, Plaintiffs would be displaced from their residence. Under such circumstances, Plaintiffs' opportunity to raise constitutional objections in the state forum is plainly inadequate.

Accordingly, the Court denies the Town's request that this action be dismissed in its entirety based on <u>Younger</u> abstention grounds. In reaching this conclusion, the Court recognizes that the instant action may impact the pending state court proceedings. However, it is well established that <u>Younger</u> abstention is applied on an individual basis, as if each Plaintiff stood alone. <u>See</u> <u>Doran v. Salem Inn, Inc.</u>, 422 U.S. 922, 928-29, 95 S. Ct. 2561, 45 L. Ed. 2d 648 (1975)("We do not agree . . . that all . . . plaintiffs should automatically be thrown into the same

hopper for Younger purposes . . . . While there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the Younger considerations which govern any one of them, this is not such a case;--while respondents are represented by common counsel, and have similar business activities and problems, they are apparently unrelated in terms of ownership, control, and management. We thus think that each of the respondents should be placed in the position required by our cases as if that respondent stood alone."); <u>Steffel v. Thompson</u>, 415 U.S. 452, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974).

C.    <u>Success On The Merits</u>

The Town alternatively argues that Plaintiffs have not established any likelihood of success on the merits with respect to either their due process claims, or their equal protection/Fair Housing Act claims. According to the Town, Plaintiffs' "illegal use" of the premises at issue undermines their ability to assert any due process claim. Further, the Town argues that the Fair Housing Act and Equal Protection Clause have no application to situations where, as here, the Town is enforcing a zoning ordinance concerning the maximum occupancy of residents in a living space.

The Court considers the Parties' arguments concerning each of the pending claims.

1.    <u>Plaintiffs' Due Process Claims</u>

Plaintiffs maintain that their payment of monthly rent to

the owner of the premises at issue creates a valid month-to-month tenancy under New York law. Having established a legitimate property interest, Plaintiffs contend that, absent circumstances constituting an imminent threat to their health and safety, the Due Process Clause of the Fourteenth Amendment requires that they receive notice and a hearing prior to being restrained from residing at their homes. Plaintiffs assert that the Town's practices violate such rights, thus establishing a likelihood of success with respect to their due process claims.

According to the Town, because there is no dispute that Plaintiffs' purported month-to-month tenancies are created in violation of state zoning ordinances, and because the prevailing conditions within the premises violate state and town housing safety regulations, Plaintiffs have no legitimate property interest to assert in the furtherance of their due process claim. The Town further posits that any concerns with respect to the protection of Plaintiff's due process rights are mitigated by the fact that each of the TROs at issue are signed by New York State Supreme Court Judges. Finally, the Town claims that "to permit plaintiffs to obtain relief, notwithstanding the illegal and unsafe use of the premises, would violate public policy by, inter alia, condoning illegal actions . . . [and] limit the Town's ability to enforce its Code to protect the health and safety of its residents." (Town's Post-Hearing Mem. of Law at 7.)

a. <u>The Demands Of Due Process</u>

A fundamental prerequisite to a due process claim is a legitimate property interest. <u>See</u> <u>Krimstock v. Kelly</u>, 306 F.3d 40, 60-61 (2d Cir. 2002); <u>Luedeke v. Village of New Paltz</u>, 63 F. Supp. 2d 215, 220 (N.D.N.Y. 1999) (citing <u>Gudema v. Nassau County</u>, 163 F.3d 717, 724 (2d Cir. 1998). Whether or not Plaintiffs have a cognizable property interest is to be determined by New York law. <u>See</u> <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).

Once a Plaintiff has established a cognizable property interest, the inquiry shifts to what process is due. <u>See</u> <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484 (1972). "Ordinarily, the Due Process Clause requires that the state not deprive an individual of . . . [a] property interest without affording notice and some opportunity to be heard prior to the deprivation." <u>Gudema</u>, 163 F.3d at 724; <u>see also</u> <u>U.S. v. James Daniel Good Real Prop.</u>, 510 U.S. 43, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993) ("<u>Good</u>"); <u>U.S. v. Premises & Real Prop. at 4492 S. Livonia Road</u>, 889 F.2d 1258, 1263 (2d Cir. 1989) ("<u>Livonia</u>"). There are, however, certain extraordinary circumstances where such notice and an opportunity for a hearing may be deferred until after the initial deprivation. <u>See</u> <u>Livonia</u>, 889 F.2d at 1263. Three criteria have been recognized in such situations: (1) the seizure is necessary to secure an important governmental or public

interest; (2) there is a "special need for very prompt action"; and (3) "the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a governmental official responsible for determining under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." Id. (quoting Fuentes v. Shevin, 407 U.S. 67, 81-82, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972) (emphasis in original)).

Also of note, this Circuit has recognized that where, as here, the seizure of property is effected pursuant to an ex parte order approved by a judicial official, a plaintiff is afforded "some process" prior to the seizure. Livonia, 889 F.2d at 1264. The adequacy of such process is assessed under the standards articulated by the Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The Mathews balancing test requires the Court to assess: (1) the significance of the property at stake; (2) the procedures used and the probable value of additional procedural safeguards; and (3) the competing interest in effecting a pre-notice seizure. See Livonia, 889 F.2d at 125-59 (citing Mathews, 424 U.S. at 335).

In accordance with the foregoing criteria, the Court first addresses whether or not Plaintiffs have any cognizable property interest under New York law giving rise to their due process claims, and then, if necessary, determines whether

Plaintiffs are receiving adequate process from the Town.

b.    Plaintiffs' Property Interests

Plaintiffs contend that their monthly payment of rent establishes a valid property interest in a month-to-month tenancy. See Weiden v. 926 Park Ave. Corp., 154 A.D.2d 308, 309, 546 N.Y.S.2d 595 (1st Dep't 1989) ("the defendants accepted rent from plaintiff, making him a month-to-month tenant").  As a general principle, this conclusion is undisputed.  However, the Town accurately points out that the instant inquiry is not that simple. Specifically, the Town argues that "illegal occupants of a building have no constitutional property interest in the apartments they occupy." (Town's Post-Hearing Mem. of Law at 5.); see De Villar v. City of New York, 628 F. Supp. 80, 84 (S.D.N.Y. 1986) ("Plaintiffs were trespassers, squatters and illegal occupants of the building. They had no constitutional property interest in the apartments they occupied.").  According to the Town, the premises at issue are all illegal boarding houses with tenancies created in violation of Town zoning ordinances and thus, Plaintiffs have no legitimate property interest to rely upon in raising their due process objection.

The Town relies heavily upon the reasoning contained in the concurring opinion of Judge Max Rosenn in Ruiz v. New Garden Township, a case recently decided by the United States Court of Appeals for the Third Circuit.  376 F.3d 203 (3d Cir. 2004).  Ruiz involved a due process challenge asserted by month-to-month tenants

23

of a mobile trailer park. The owner of the trailer park was served with a notice that the property at issue was not zoned for trailer park use. The owner's appeal of the notice of violation was denied. Id. at 205.

The owner was then directed, pursuant to a town enforcement order, to serve the tenants with notice by March 1, 2001, that they had to leave the property by July 2001. The tenants received the notice to quit and, in response, commenced a federal action seeking to enjoin the Town order requiring the owner to serve the notices to quit. Id. at 205-06. The plaintiffs claimed that they had a property interest in their leaseholds, and thus, they were entitled to participate in the appeals hearing before the town zoning board.

Judge Theodore A. McKee, writing for the Third Circuit, rejected the plaintiffs' claims. Specifically, Judge McKee found that the plaintiffs "claimed property interest . . . entitled them to only 30 additional days of tenancy after . . . notification . . . of termination." Because the order to quit permitted the plaintiffs more notice of termination than they were entitled pursuant to their leases, Judge McKee reasoned that the zoning board "could not have deprived the tenants of any property interest to remain on the premises." Accordingly, Judge McKee determined that "there could not have been an unconstitutional taking of a protected property interest." Id. at 208.

Judge Rosenn, in a separate concurring opinion, explained that the inquiry need not be so complex. According to Judge Rosenn:

> property interests are created by state law . . . Where the residential use of the property at issue was set up in violation of state county, and municipal laws, such use was null and void ab initio . . . [and the] plaintiff-tenants . . . ha[ve] no vested property interest in the . . . rental use of the property. Where there is no property right, there can be no viable due process claim as a matter of law.

Id. at 210.

Judge Rosenn's reasoning is compelling. Similar to the Pennsylvania law that provided the impetus for Judge Rosenn's analysis, New York law recognizes the concept that a lease created in violation of New York zoning and occupancy law creates no cognizable property rights. See, e.g., Paulino v. Wright, 210 A.D.2d 171, 620 N.Y.S.2d 363 (1st Dep't 1994); Morillo v. City of New York, 178 A.D.2d 7, 582 N.Y.S.2d 387 (1st Dep't 1992).

But Judge Rosenn's approach also has flaws. As noted by Plaintiffs, Judge McKee points out the deficiency with Judge Rosenn's line of reasoning, stating that "an analysis that begins and ends with charging the plaintiffs with the outcome" of the town's action, would ignore the very constitutional challenge presented – the lack of opportunity to contest the violation. See Ruiz, 376 F.3d at 207 n.9.

After considering the Parties' arguments, the Court finds

that the concerns raised by Plaintiffs (and Judge McKee)[10] have little persuasive force where, as here, it is undisputed that no valid tenancy was ever created under New York state law. The purported leaseholds at issue are plainly in violation of zoning ordinances, and have been so since their inception. This fact is not disputed. While the Court is troubled by the apparent attendant result of this conclusion – the Town's insulation from any due process challenge to the manner by which it enforces its housing code against admitted violators – the Court cannot ignore the maxim that property interests, such as those asserted by Plaintiffs, are creatures of state law – and a cognizable property interest is the backbone of any procedural due process claim. Accordingly, because Plaintiffs leaseholds were created in violation of state law, their due process claims must fail.

Plaintiffs' remaining arguments do not salvage this fatal flaw. Plaintiffs' contention that they have a property interest as "lawful occupants" of the residences is belied by their simultaneous concession that the subject leaseholds were created in

---

[10]     It should be noted that the <u>Ruiz</u> Court expressly avoided the issue of whether the plaintiff-tenants had any cognizable property right to support a due process claim. Indeed, if anything, the majority indicated it would not be inclined to recognize that plaintiffs had any cognizable property right. <u>Ruiz</u>, 376 F.3d at 207 ("plaintiffs' property interest here is tenuous at best because any such interest appears to have been created in violation of a zoning ordinance"). Moreover, in <u>Ruiz</u>, unlike here, the plaintiffs wished to be present at the town's zoning hearing in order to <u>challenge</u> the allegation that there was, indeed, a violation. <u>Id.</u> at 207 n.9. The Plaintiffs here do not, in any way, dispute that the premises where they reside are in compliance with New York zoning regulations.

violation of Town zoning law. For that reason, Plaintiffs'
reliance upon the holdings in <u>Good</u>, 510 U.S. at 53-54, <u>Grayden v.
Rhodes</u>, 345 F.3d 1225, 1233-37 (11th Cir. 2003), and <u>Flatford v.
City of Monroe</u>, 17 F.3d 162, 167 (6th Cir. 1994) is unavailing. In
each of those cases, unlike here, there was no dispute as to the
baseline validity of the tenant's leasehold. <u>Good</u> involved a civil
forfeiture proceeding against a defendant that pled guilty to drug
charges. <u>Flatford</u> and <u>Grayden</u> involved the rights of tenants that
were evicted from their leaseholds based on alleged exigent
circumstances threatening the health or safety of the community and
the residents. Undergirding the due process claim in each of those
actions was a cognizable leasehold, created in accordance with
prevailing state law.

Finally, Plaintiffs' suggestion that New York statutory
law confers a cognizable property right sufficient to support their
due process is mistaken. While it is undisputed that New York's
Nuisance Law provides for notice prior to the ouster of occupants,
and the pertinent penalty provisions of the Town's Zoning Code only
punish code violations with fines and make no provision for
obtaining the <u>ex</u> <u>parte</u> TROs at issue, procedural safeguards do not,
by themselves, create a property interest sufficient to support a
due process claim. <u>See</u> <u>De Villar</u>, 628 F. Supp. at 84 ("Even if
plaintiffs could point to a procedural requirement under New York
State law [requiring notice prior to ouster of tenants from an

apartment] this would not give them a constitutionally protected right."); see also Olim v. Wakinekona, 461 U.S. 238, 250, 103 S. Ct. 1741, 1748, 75 L. Ed. 2d 813 (1983) (rejecting plaintiff's assertion that prison regulations created a cognizable liberty interest, protected by the Due Process Clause, and stating, "Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." (emphasis added)).

To the extent Plaintiffs allege that the Town is inequitably, or discriminatorily enforcing its laws, such claims should be styled - as they are alternatively here - as equal protection claims. See Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) ("the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." (internal quotations omitted)); see also English v. Town of Huntington, 448 F.2d 319, 323 (2d Cir. 1971) ("[i]t is elementary that the due process clause does not prevent a city from taking legal steps to require the correction, or failing that, the elimination of housing which constitute such sanitary or fire hazards as to endanger the health or lives of occupants or persons living in the vicinity. . . . Of course, in

exercising this power, a municipality must act consistently with the equal protection clause."); <u>Norwalk CORE v. Norwalk Redevelopment Agency</u>, 395 F.2d 920, 937 (2d Cir. 1968).[11]

For the foregoing reasons, the Court finds that Plaintiffs have failed to establish a likelihood of success on the merits with respect to their procedural due process claims. Because the determination is based upon Plaintiffs' failure to cite to any legitimate property interest, the Court does not reach the issue of what process is due.

2.   <u>Plaintiffs' Fair Housing Act Claims</u>

Plaintiff does not dispute the legitimacy of the Town's zoning laws, including those pertaining to overcrowding. (Pls.' Reply Mem. of Law at 9.) However, Plaintiffs claim that the Town's recently adopted code enforcement procedures have a disparate, adverse impact on Latinos and have been undertaken with the intent to discriminate against Latinos depriving them of housing in violation of the Fair Housing Act of 1968, as amended by the Fair Housing Act Amendments Act of 1988 (collectively, the "FHAA"). 42 U.S.C. § 3601 <u>et seq.</u>   The Town proffers only one objection to Plaintiffs' claim, contending that the FHAA has no proper application to a municipality's administration of zoning provisions concerning overcrowding. (<u>See</u> Town Mem. of Law in Opp. to Pls.'

_____

[11]   Plaintiffs, however, have not pressed their equal protection claims in support of the instant application for a preliminary injunction and thus, the Court does not consider that issue.

Request for a Preliminary Injunction at 8.)

a. The Fair Housing Amendments Act

"[T]he FHAA . . . prohibit[s] governmental entities from implementing or enforcing housing policies in a discriminatory manner." Tsombanidis v. West Haven Fire Dep't., 352 F.3d 565, 573 (2d Cir. 2003); see also 42 U.S.C. § 3604. The FHAA protects against discrimination on the basis of "race, color, religion, sex, familial status, or national origin." See 42 U.S.C. § 3604. "The provisions of [the FHAA] are to be given broad and liberal construction, in keeping with Congress' intent . . . of replacing racially segregated housing with truly integrated and balanced living patterns." Cabrera v. Jakabovitz, 24 F.3d 372, 388 (2d Cir. 1994) (internal quotations omitted).

A plaintiff challenging a municipality's zoning ordinances or a municipality's zoning ordinance enforcement may rely upon two theories: (1) disparate impact; and/or (2) discriminatory intent. See Huntington Branch Nat'l Assoc. for the Advancement of Colored People, 844 F.2d 926, 933-34 (2d Cir. 1988); Oxford House, Inc. v. Town of Babylon, 819 F. Supp. 1179, 1183 (E.D.N.Y. 1993). Here, Plaintiffs allege a FHAA violation on both theories. The Court will address each argument in turn. However, the Court first addresses the Town's contention that § 3607(b)(1) of the FHAA precludes Plaintiffs' claims.

b. Section 3607(b)(1) Of The FHAA

Section 3607(b)(1) provides that: "Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). The Town cites to numerous cases applying this section. In each case cited, the court holds that statutes that place a cap on the number of occupants at a given residence are exempt from the FHAA. <u>See, e.g., City of Edmonds v. Oxford House, Inc.</u>, 514 U.S. 725, 733, 115 S. Ct. 1176, 1981, 131 L. Ed. 2d 801 (1995).

But the Town's reliance upon such cases - and § 3607(b)(1) generally - ignores the gravamen of Plaintiffs' claims. As explained above, Plaintiffs do not challenge the validity of the Town's maximum occupancy restriction. Rather, Plaintiffs challenge the methods by which the Town has recently sought to enforce its housing codes. Specifically, Plaintiffs contend that when enforcing building and housing code provisions, the Town has unfairly targeted Latino housing, saddling the inhabitants with <u>ex parte</u> TROs while not issuing any prior notices of violation. Plaintiffs point out that such procedures constitute a significant departure from those previously observed by the Town, and have not been employed against anyone who is not Latino.

If the Court were to adopt the Town's line of reasoning, § 3607(b)(1) would allow a municipality to blatantly discriminate on the basis of race provided that such discrimination was effected

pursuant to a statute concerning maximum occupancy.  For example,
assume a town adopted as part of its zoning code a requirement that
each premises must have two thousand square feet per occupant –
but only enforced the code provision against African-Americans.
According to the Town, such actions would be permissible under the
FHAA because the code provision concerned maximum occupancy.  Such
a result could not have been envisioned by Congress; the exemption
only applies to occupancy restrictions that "<u>apply uniformly to all
residents</u> of all dwelling units," <u>Edmonds</u>, 514 U.S. at 733
(emphasis added).  It has no application where selective or
discriminatory enforcement of zoning ordinances is alleged.  <u>See
Huntington Branch</u>, 844 F.2d at 936-37.  The Court, therefore,
rejects the Town's argument that § 3607(b)(1) precludes Plaintiffs
FHAA claims.[12]

      c.   <u>Disparate Impact</u>

In order to establish a FHAA violation based upon a
theory of disparate impact, a plaintiff must provide evidence of:
"(1) . . . outwardly neutral procedures, and (2) a significantly
adverse or disproportionate impact on persons of a particular type
produced by the defendant's facially neutral acts or practices."
<u>Tsombanidis</u>, 352 F.3d at 574-75   "The basis for a successful

---

[12]    Even assuming, <u>arguendo,</u> that § 3607(b)(1) precluded any FHAA claim in this case related to the enforcement of zoning ordinances that pertain to maximum occupancy, that would still not preclude Plaintiffs' claims.  Enforcement of the Town's maximum occupancy restrictions was only one of the bases for the TROs that are being issued.

disparate impact claim involves a comparison between two groups - those affected and those unaffected by the facially neutral policy. This comparison must reveal that, although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." <u>Id.</u> at 575 (internal quotations omitted). Oftentimes, disproportionate impact is demonstrated through the use of statistics. <u>Id.</u> at 576.

A defendant can rebut a discriminatory impact claim by establishing that "'its action furthered, in theory, and in practice, a legitimate bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.'" <u>Id.</u> at 575 (quoting <u>Huntington Branch</u>, 844 F.2d at 936). "In the end, the court must balance the plaintiff's showing of discriminatory impact against the defendant's justifications for its conduct." <u>Oxford House, Inc. v. Town of Babylon</u>, 819 F. Supp. 1179, 1183 (E.D.N.Y. 1993) (citing <u>Huntington Branch</u>, 844 F.2d at 936).

Here, Plaintiffs claim, and the Town does not dispute, that the Town has undertaken an outwardly neutral policy of stepped up quality of life enforcement that has resulted in a disproportionate adverse impact on Latinos. As evidence of the impact of the Town's new program, Plaintiffs cite to the fact that, while only 8.1% of the population of the Hamlet of Farmingville is Latino, every Farmingville home that has been closed pursuant to an

*ex* *parte* TRO was occupied by Latinos. These figures are consistent with those where a prima facie case of discrimination has been found. *See, e.g.,* *Metropolitan Hous. Dev. Corp. v. Arlington Heights*, 558 F.2d 1283, 1286-88 (7th Cir. 1977).[13]

There is little doubt that the Town has a significant interest in enforcing both Town zoning laws and Town and State nuisance and safety. The Town, however, proffers little argument that the use of *ex* *parte* TROs, without any prior notice of violation, serves the Town's enforcement interest with the least discriminatory impact.

In obtaining the *ex* *parte* TROs, the Town relied upon two general bodies of statutory law: (1) Town Code, most specifically the Town's "Neighborhood Preservation Act," as codified at §§ 82-1 *et seq.* of the Brookhaven Town Code, and §§ 84 and 85 of the Code; and (2) New York State Uniform Fire Prevention and Building Code. The typical violations cited were lack of rental permit, overcrowding, exposed plumbing and electrical wiring, blocked ingress/egress and windows, lack of smoke and carbon monoxide detectors, and litter. (Pls.' Exs. 1-5, 7-11.) Many of these

---

[13] Based on the arguments presented and the evidence adduced at the Hearing, the Court harbors doubts as to whether Plaintiffs are truly complaining of any neutral policy adopted by the Town. Rather, the gravamen of Plaintiffs' claim appears to be that the Town has specifically targeted premises where Latinos reside, and enforced the Town and State Zoning and Safety codes in an unequal manner. However, because the Town concedes that the actions complained of are occurring pursuant to its general objectives to enhance enforcement of its quality of life laws, the Court finds that Plaintiffs have adequately alleged a neutral policy.

problems also amount to a nuisance in violation of New York's Multiple Dwelling Law § 305.

The penalties for violation of the cited provisions of the Town's Neighborhood Protection Act are:

> (1) [] a fine not less than $250 and not exceeding $1,000 or by imprisonment for a period not to exceed 15 days, or both for conviction of a first offense.
> (2) [] a fine not less than $1,000 nor more than $3,000 or by imprisonment for a period not to exceed 15 days, or both, for conviction of the second of the two offenses, both of which were committed within a period of five years.

Town L. § 82-15. There are no specific provisions in the Neighborhood Protection Act permitting the Town to obtain the <u>ex parte</u> TROs at issue.[14] Nor are there specific provisions in §§ 84 and 85 for such relief.

The provisions governing New York's Nuisance law provide for <u>ex parte</u> remedies only after notice of the violation is provided to, at least, the landlord or owner of the premises. Here, the Town did not set forth any evidence indicating such notice was provided.

Notwithstanding these statutory provisions, the Town may,

---

[14]     While the Town cites Town Law § 268 for the proposition that it is authorized to seek preliminary injunctive relief without establishing special damage or injury to the public, <u>See, e.g.,</u> <u>Town of Brookhaven v. Penkowski</u>, 288 A.D.2d 371, 733 N.Y.S.2d 475 (2d Dep't 2001), that statute does not contain any provision specifically authorizing the TROs at issue. Rather, the statute simply authorizes Town's to take "any appropriate action" to remedy zoning violations. N.Y. Town Law § 268.

as it represents it has in this case, rely upon its police power to obtain the TROs at issue. It is well established that the Town may invoke its police power to take any steps necessary to abate imminent threats to the health, safety and well-being of its residents. See, e.g., In re Belle Harbor Realty Corp., 35 N.Y.2d 507, 511, 364 N.Y.S.2d 160, 323 N.E.2d 697 (1974). However, New York has imposed upon itself the restraint that any actions taken pursuant to the police power be "kept within the limits of necessity." Id. (internal quotations omitted).

Here, the necessity for the Town's ex parte restraints on re-entry at the vast majority (ten of eleven) of the subject premises is suspect. At ten of the eleven premises, there is no indication that the Town took any steps with respect to formal enforcement (i.e., issuance of tickets or summons) of code provisions prior to issuing TROs. Indeed, the only witness provided by the Town testified that he was not aware of any enforcement procedures undertaken before the issuance of TROs concerning the premises he investigated. (Tr. at 422.) Further, the Town's purported need for urgent action is belied by the fact that the Town waited, at a minimum, two months after observing the dangerous conditions before seeking TROs restraining re-entry to the premises.

In light of the foregoing, the Court finds that Plaintiffs have set forth a sufficient disparate impact case to

satisfy a showing of likelihood of success on the merits with respect to their Fair Housing Act claims.

      d.   <u>Discriminatory Intent</u>

The Second Circuit has set forth several factors probative of discriminatory intent in a FHAA case: "(1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; and (5) departures from normal substantive criteria." <u>Id.</u> at 580.

Because the Court has already concluded that Plaintiffs have satisfied the "likelihood of success" criteria with respect to their FHAA disparate impact claim, the Court does not address, at length, the contours of Plaintiffs' discriminatory intent claim. The Court notes, however, that many of the facts supporting Plaintiffs' disparate impact claim are probative of discriminatory intent in this case. Most notably, the enforcement procedures: (1) have had a 100% impact on Latinos; and (2) constitute a marked departure from the procedures adhered to in prior zoning enforcement actions brought by the Town.

    D.   <u>Irreparable Injury</u>

Having established a likelihood of success on the merits with respect to their Fair Housing Act claim, the Court next considers whether Plaintiffs have established irreparable harm.

The Town argues that Plaintiffs cannot establish irreparable harm because Plaintiffs either reside or have resided in housing that is, admittedly, in violation of New York State fire codes and Town of Brookhaven zoning and housing codes. Because these residences are unsafe for habitation, the Town argues that Plaintiffs cannot be truly harmed by any displacement. Magnifying this fact, the Town also maintains that Plaintiffs earn sufficient funds as day laborers to afford safe, legal housing but decline to do so. Instead, Plaintiffs opt to live in squalid and inexpensive conditions so that they can wire portions of their wages back to family members residing in Mexico.

Plaintiffs argue that the housing market in Brookhaven is too scarce for them to be able to find any housing on a short term basis. The contention is not that location of housing is impossible; Plaintiffs simply argue that, due to the short notice of eviction, they have no meaningful ability to locate alternative housing and are forced to the streets without significant relocation assistance. (Pls.' Reply Mem. of Law at 3.) In short, Plaintiffs argue that the state court TROs render them homeless – a condition more threatening to themselves and the community than their continued residence at the subject premises.

Sadly, this is a close question. The danger at the subject premises, whether imminently threatening or not, is significant. The threat posed by substantial overcrowding, coupled

with exposed wiring and blocked ingresses/egresses cannot be lightly disregarded. Plaintiffs insist that their ouster "create[s] a dangerous nuisance and public health crisis substantially greater than that posed by the safety violations that the Town seeks to cure," but they do not truly explain why this is the case. (Pls.' Mem. of Law in Supp. of Pls.' Mot. for a Prelim. Inj. at 7.) While an unfortunate reflection of the conditions under which Plaintiffs reside, there is reason to question whether ouster is actually in their best interest.

This Court, however, recognizes that several courts have presumed irreparable harm upon a showing of a likelihood of success on the merits with respect to an FHAA claim. See, e.g., Innovative Health Systems, Inc. v. City of White Plains, 931 F. Supp. 222, 241 (S.D.N.Y. 1996); Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir. 1984). Given that Plaintiffs have met their burden with respect to the FHAA claims, and the fact that the winter is upon us, the Court finds Plaintiffs to have sufficiently established irreparable harm. The Court, therefore finds that Plaintiffs have set forth a sufficient showing for the issuance of a preliminary injunction.

E.    Relief

While the Court grants injunctive relief, the specific relief requested by Plaintiffs is denied as either inappropriate or overreaching.

39

The Court is not a proxy for the Town legislature. Moreover, the Court is loath to interfere with the operations of those individuals enforcing compliance with zoning and safety codes. Thus, Plaintiffs' request that the Court preclude further investigation of code violations at the purportedly targeted homes is denied. Similarly, Plaintiffs' request that the Court require the Town to seek out the opinion of a disinterested expert in all cases where an <u>ex</u> <u>parte</u> eviction is sought is denied as overreaching. Instead, the Court enjoins the Town from obtaining <u>ex</u> <u>parte</u> TROs restraining occupants from re-entry to the premises where they reside without delivering prior notices of violation in a manner consistent with New York State and Town law. In issuing this relief, the Court does not prohibit the Town from obtaining <u>ex</u> <u>parte</u> TROs under circumstances of imminent necessity that would otherwise justify the issuance of such orders.

In addition, the Court denies Plaintiffs' request that the Court require the Town to provide more meaningful post-ouster assistance. The notice that has been posted by the Town at the "closed off" premises provides contact information for several agencies that might assist evacuees in finding relocation housing and financial assistance and support. (Court Ex. 1.) The Court heard testimony at the Hearing that many of the Plaintiffs did not avail themselves of certain of these services due to their immigration status, or for other reasons. To the extent there was

40

evidence that assistance was offered, but declined, the Court finds no basis to affirmatively require the Town to provide any further assistance. Hopefully, the need for emergency relocation assistance will be mitigated by providing some notice to the occupants prior to ouster.

<u>CONCLUSION</u>

For the reasons explained above, Plaintiffs' motion for a preliminary injunction is GRANTED.  The Court enjoins the Town from obtaining <u>ex</u> <u>parte</u> TROs restraining occupants from re-entry to the premises where they reside without delivering prior notice of violation in a manner consistent with New York State and Town law.

SO ORDERED

<u>/s/ JOANNA SEYBERT</u>
Joanna Seybert, U.S.D.J.

Dated: December 15, 2005
Central Islip, New York